IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OCR SOLUTIONS, INC.,
  A Florida corporation,

    Plaintiff,

v.

CHARACTELL, INC., a Massachusetts
corporation, and CHARACTELL, LTD,
an Israeli company,

    Defendants.
_____/

CASE NO.

TRIAL BY JURY DEMANDED

## COMPLAINT

The Plaintiff, OCR SOLUTIONS, INC., a Florida corporation, sues the Defendants, CHARACTELL, INC., a Massachusetts corporation, and CHARACTELL, LTD., an Israeli company, for breach of joint venture agreement, unjust enrichment, breach of fiduciary duty and breach of contract, and alleges:

## THE PARTIES

1. Plaintiff OCR SOLUTIONS, INC. is a corporation duly organized under the laws of the State of Florida with its principal place of business at 6735 Conroy Road, Suite 207, Orlando, FL 32835.

2. Defendant CHARACTELL, INC. is a corporation duly organized under the laws of the State of Massachusetts with its principal place of business at 34 Wessex Road, Newton, MA 02459.  Upon information and belief, Defendant CHARACTELL, INC. is a fully-owned subsidiary of Defendant CHARACTELL, LTD.

1

3. Defendant CHARACTELL, LTD. is an Israeli corporation with Registration Number 512653163 located at Bney Efrayim Street 213, Tel Aviv, Israel. Upon information and belief, Defendant CHARACTELL, INC. is a fully-owned subsidiary of Defendant CHARACTELL, LTD.

## JURISDICTION AND VENUE

4. This is a suit for breach of fiduciary duty, and in the alternative breach of joint venture agreement under Florida law for damages in excess of $75,000.00. This Court has jurisdiction pursuant to 28 U.S.C. §1332.

5. This Court has personal jurisdiction over Defendants because Defendants purposely directed activity into this district specific to the causes of action at issue, including but not limited to, teaming with Plaintiff in this district to develop a software solution and marketing that jointly-developed software solution repeatedly at trade shows in this district through Plaintiff. In addition, upon information and belief, this Court has general personal jurisdiction over Defendants as a result of Defendants' business partnership with a Tampa, Florida entity named Fairfax Imaging, Inc. to offer Defendants' products in this district.

6. Venue is proper in this judicial circuit pursuant to 28 U.S.C. §§ 1391(b)(2) & (c)(3).

## GENERAL ALLEGATIONS

7. At all material times, Plaintiff has been in the business of providing customized data capture solutions for clients.

8. As part of this service, Plaintiff developed specific expertise in identification ("ID") scanning applications that read and capture personal information from ID cards.

9. Plaintiff integrates ID scanning applications in over thirty (30) vertical markets including, without limitation, healthcare, financial, accounting, legal, security, scrap metal and automotive industries and developed numerous contacts and client relationships in these industries.

10. As of 2012, Plaintiff operated out of Vermont and sold various products to clients that Plaintiff had developed including its InfoScan Optical character recognition application, which Plaintiff and others developed independent of Defendants.

11. Upon information and belief, Defendant CHARATELL, LTD was founded in 1998 with the goal of developing advanced character recognition technology.

12. Defendant CHARACTELL, LTD established its subsidiary CHARACTELL, INC. in the United States in 2004 to further CHARACTELL, LTD's business in the United States.

13. At all times, Paz Kahana has been the president of CHARACTELL, INC.

14. At all times relevant to this action, Paz Kahana has also been the President and CEO of Defendant CHARACTELL, LTD.

15. At all times relevant to this lawsuit, Defendants CHARACTELL, INC. and CHARACTELL, LTD. have acted jointly and without distinction with respect to Plaintiff.

16. In December 2012, Plaintiff and Defendants began considering working together and exchanging confidential information for purposes of developing a software product together.

17. To this end, on December 11, 2012, Plaintiff and Defendants executed a Mutual Confidentiality Agreement to allow them to share proprietary business information in confidence.

18. This Mutual Confidentiality Agreement has remained in effect ever since.

19. Desirous of developing a more robust scanning application, Plaintiff approached Defendant in 2014 to co-develop an ID scanning solution.

20. At the time, Defendant, a software developer, had no experience in the ID scanning industry, no contacts in the ID scanning industry other than Plaintiff and none of its own clients in the ID scanning industry.

21. Realizing that the development of an ID scanning application would be lucrative to both parties, Plaintiff and Defendant agreed orally to work together through a joint venture for the common purpose of co-developing a new ID scanning application, which came to be known as idCliQ.

22. To this end, Plaintiff contributed its valuable database of ID images (such as electronic template forms for documents such as drivers licenses) from jurisdictions throughout the United States and around the world that OCR Solutions had collected over many years with great effort.

23. Defendants did not otherwise have access to these ID images.

24. Without these ID images, Defendants could not have developed the idCliQ software properly or fully.

25. In addition, Plaintiff detailed for purposes of the parties' joint efforts how the idCliQ software must function. This included specifications by Plaintiff of the necessary programming requirements.

26. Plaintiff also contributed the InfoScan software towards the development of idCliQ. Plaintiff and Defendants utilized the InfoScan software in developing idCliQ.

27. Plaintiff also tested the idCliQ software during development. As part of this testing, Plaintiff made the idCliQ software available to and provided feedback from its clients, prospective end-users of idCliQ to which CharacTell otherwise had no access.

28. In addition, Plaintiff provided instructions for correcting issues that arose during the development of idCliQ and provided images detailing how certain screenshots should look.

29. Plaintiff also contributed countless hours to the development of the application, including instructions regarding how the software must function, programming requirements, software testing, troubleshooting problems during software development, and providing feedback on how the application would appear to end-users.

30. Plaintiff also invested $10,000.00 for the purchases of licenses critical to the development of the software.

31. In return, Defendants used their expertise, based on direction and feedback from Plaintiff, to program the idCliQ application.

32. This development process for idCliQ occurred from 2014 through 2016.

33. Near the beginning of this development process, Plaintiff moved its operations from Vermont to Orlando, Florida.

34. After Plaintiff relocated to Florida, on February 2, 2015, Plaintiff contacted Defendants by email, writing in relevant part: "I never received the joint venture agreement that you spoke about before my move. Can you please forward when you have a moment?"

35. Defendants responded by email later that day: "You are correct. I drafted in while I was in Israel. In the course of doing this I realized that we actually do not have in place even an agreement for FormStorm. Let's talk tomorrow (Tuesday) to see how to correct both issues."

36. FormStorm is a software application developed by Defendants that is separate from idCliQ and for which Plaintiff negotiated a separate arrangement with Defendants.

37. Not long thereafter, Defendants sent a proposed agreement to Plaintiff meant to address both issues for FormStorm and Plaintiff's interest in the idCliQ software.

38. Plaintiff found the proposed agreement unacceptable in great part because it did not properly reflect Plaintiff's interest in the idCliQ software.

39. Nevertheless, even in this initial draft from Defendants, Defendants offered Plaintiff up to 30% of the proceeds obtained from any sale of the idCliQ technology or up to 15% of proceeds obtained from any sale of Defendant(s) itself.

40. From this time period on, Defendants became more and more antagonistic with Plaintiff and attempted to cut Plaintiff out of the project.

41. Although Plaintiff sent Defendants comments on their proposed written agreement and asserted that Plaintiff had additional rights not captured therein, Defendants scoffed and attempted to bully Plaintiff into giving up its rights in idCliQ.

42. Eventually, Defendants effectively refused to address the issue of an overall written agreement between the parties and instead continued to attempt to close Plaintiff out of its interest in idCliQ.

43. Thus, while the parties had agreed to a joint venture for the co-development of the idCliQ software, this agreement was never memorialized in writing even though it was capable of being performed within one year.

44. This prior agreement included joint control over the development of the software, a joint proprietary interest in the finished product, a right to share equally in the profits from all sales/licenses of the idCliQ software, almost all of which, at least initially, were to go to Plaintiff's customers. To the extent the project was unsuccessful, the agreement also included sharing losses.

45. Having no customers of their own in the ID scanning industry, Defendants developed a plan to try to steal Plaintiff's clients.

46. To this end, Defendants offered to visit certain of Plaintiff's clients to close deals relating to the idCliQ software, sometimes representing that Defendants' representative would "happen" to be in the area of the client.

47. Understanding that the parties were working together to try to develop and market the idCliQ software, trusting its partner, and relying on the inability of Defendants to misappropriate Plaintiff's proprietary business information (such as contacts) pursuant to the parties' Mutual Confidentiality Agreement, Plaintiff agreed to allow meetings to occur so that Defendants could close deals in the name of Plaintiff.

48. Instead of working jointly with Plaintiff, however, and helping to close a deal in the name of Plaintiff, Defendants chose instead to close their own deals with Plaintiff's clients without informing Plaintiff of the contents of those deals.

49. By way of example, Defendants closed a deal with Plaintiff's client Jumio in the name of CharacTell instead of Plaintiff. Afterwards, despite many requests, Defendants have refused to provide Plaintiff with the specifics of the deal or to transfer the agreement into Plaintiff's name.

50. More recently, when Plaintiff instructed Defendants not interfere with or to try to steal Plaintiff's clients, Defendants responded that they would do whatever they wanted with Plaintiff's clients.

51. In addition, Defendants have attempted to confuse potential clients into believing that Defendants are affiliated with Plaintiff by adopting Plaintiff's name in their website headers and text, but only done so for Defendants' benefit.

52. Thus, a Google search for "CharacTell" now returns the following: "CharacTell - Advanced OCR Solutions."

53. In addition, Defendants' Internet homepage now includes Plaintiff's name: **The Easiest to Use and Most Robust OCR Solutions Anywhere.**

54. Defendants made this change to their homepage between February and March 2016.

55. All conditions precedent to the maintenance of this action have occurred, have been performed, or have been waived.

## COUNT I
## BREACH OF JOINT VENTURE AGREEMENT BY DEFENDANTS

56. Paragraph 1 through 55 are incorporated and realleged hereto as if set forth fully herein.

57. As evidenced by their actions, Plaintiff and Defendants intended to enter into and did enter into a valid and enforceable joint venture agreement for the co-development of the idCliQ software.

58. Plaintiff contributed to this joint venture, among other contributions, at least $10,000 in funds (while Defendants plead poverty and threatened to go out business, thereby terminating the project), a vast number of identification templates from jurisdictions around the United States and the world to which Defendants otherwise had no access that were requested and used in developing idCliQ, information and direction as to how idCliQ should function, programming requirements and specifications, the InfoScan software used as a tool for developing idCliQ, solutions to problems that arose during development, exhaustive testing, feedback from prospective end-users to which CharacTell had no access.

59. In return, Defendants, which had no contacts or clients in the relevant market, used its expertise based on direction and feedback from Plaintiff, to program idCliQ.

60. As a result, Plaintiff and Defendants had and have a joint property interest in idCliQ through which both expected to share profits.

61. To this end, Plaintiff and Defendants generally split proceeds from sales of idCliQ and/or licenses therefore.

62. Implied in this arrangement was an obligation to share in losses that might occur from the joint venture.

63. Defendant breached the parties' joint venture agreement when it failed to properly split profits, account for sales to Plaintiff, acknowledge the parties' equal ownership of the idCliQ software and provide Plaintiff a copy of all source code for idCliQ.

64. Plaintiff has suffered damages as a result of Defendant's breach of the parties' joint venture agreement.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, interest, costs, and for any such further relief this Court deems just and appropriate as well as a full and accurate copy of all versions of idCliQ and its source code.

## COUNT II
## UNJUST ENRICHMENT BY DEFENDANTS

65. Paragraph 1 through 63 are incorporated and realleged hereto as if set forth fully herein.

66. Plaintiff has conferred a benefit on Defendants, who at all times had knowledge thereof, through the contribution by Plaintiff to the development of idCliQ.

67. Defendants not only requested, but also voluntarily accepted and retain the benefits conferred by Plaintiff.

68. The circumstances render the Defendants' retention of the benefits inequitable unless the Defendants pay Plaintiff the value of the benefit received.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, interest, costs, and for any such further relief this Court deems just and appropriate or, in the alternative, a full and accurate copy of all versions of idCliQ and its source code.

## COUNT III
## BREACH OF FIDUCIARY DUTY AGAINST DEFENDANTS

69. Paragraphs 1 through 63 are incorporated and realleged hereto as if set forth fully herein.

70. Defendants owed Plaintiff a fiduciary duty as joint venturers and/or business partners to deal with each other fairly and in good faith.

71. Defendants breached the fiduciary duty owed to Plaintiff by engaging in self-dealing in contacting Plaintiff's clients beyond the scope of contact agreed to by Plaintiff and then usurping the client opportunities away from Plaintiff.

72. For instance, Defendant met with Plaintiff's client, Jumio Inc., and misappropriated and diverted Jumio away from Plaintiff for Defendants' own benefit by enticing Jumio Inc. to sign a contract for the idCliQ software directly with Defendants, thereby cutting Plaintiff out of the deal and receipt of any profits. Plaintiff has demanded a copy of the Jumio Inc. agreement, but to date, Defendant has not provided a copy of the agreement to Plaintiff.

73. Plaintiff has suffered damages as a proximate cause of Defendant's breach of its fiduciary duty owed to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, interest, costs, an accounting from Defendants and for any such further relief this Court deems just and appropriate.

## COUNT IV
## BREACH OF CONTRACT – ADP INSURANCE SERVICES, INC.

74. Paragraphs 1 through 63 are incorporated and realleged hereto as if set forth fully herein.

75. In early November, 2015, Plaintiff entered into a contract with ADP Insurance Services, Inc. for the development of a software solution called Formstorm.

76. Plaintiff subcontracted with Defendants for the development of the Formstorm software.

77. At all relevant times, Defendants were aware of the nature of Plaintiff's agreement with ADP Insurance Services.

78. Plaintiff paid Defendants $40,000.72 to perform under the subcontract.

79. Although Defendants completed the first of two parts of the programming required under the subcontract, they have failed to timely complete the project.

80. Moreover, the first part of the project completed by Defendants is worthless without completion of the second part of the project. The first part of the project would need to be redone if handled by another entity.

81. In April 2016, Defendants represented to Plaintiff that they would have to return the money to Plaintiff because Defendants would be unable to complete the project without a three-month investment of time, which Defendants were not willing to do.

82. The time for completion of the project is now way overdue and Defendants have refused to return the $40,000.72 they received for the project.

83. As a result, Defendants have breached the subcontract with Plaintiff.

84. Plaintiff has suffered damages as a result of this breach.

WHEREFORE, Plaintiff demands judgment against Defendant for $40,000.72 plus interest, costs, and for any such further relief this Court deems just and appropriate.

## TRIAL BY JURY

Demand is hereby made for trial by jury.

Dated this 13th day of October, 2016.

/s/ Joseph J. Weissman
JOSEPH J. WEISSMAN, FBN 0041424
SARAH J.M. SMITH, FBN 0069869
(Trial Counsel)
JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, LLP
403 East Madison Street, Suite 400
Tampa, Florida 33602
E-Mail: josephw@jpfirm.com
sarahs@jpfirm.com
(813) 225-2500
(813) 223-7118


*Attorneys for Plaintiff*

#3683706v1